## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MINNESOTA

In re:

|  |  |
|---|---|
| Milio International Ltd | Case No. 18-34017 |
| | Chapter 11 Case |
| Debtor | |

## AMENDED[1] MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR VOLUNTARY DISMISSAL

Debtor Milio International Limited ("Milio"), through its undersigned counsel and pursuant to 11 U.S.C. § 1112(b), hereby submits this Memorandum in Support of its Unopposed Motion for Voluntary Dismissal (the "Motion"), Dkt. No. 15. Milio states as follows:

### INTRODUCTION

Milio is a Bahamian limited company with its principal place of business in Dubai. Dkt. No. 7 ¶¶ 4, 6. It filed this chapter 11 bankruptcy case on December 30, 2018, and subsequently filed an amended schedule on January 8, 2019. Dkt. Nos. 1, 8. Milio now moves for voluntary dismissal of this bankruptcy case for cause because it has no prospect of reorganizing and no creditor objects to its Motion. *See* Dkt. No. 15.

Cause exists to support dismissal of this case because Milio has no prospect of reorganization. Milio identified three assets in its Amended Schedules: shares in ClickSWITCH Holdings, Inc. ("ClickSWITCH"); shares in Milio Investment Holdings, Limited ("MIHL"); and shares in Norman Asset Management Ltd., BVI ("Norman").

---

[1] Changes are noted in blue underline, deletions via a line through original text.

Dkt. No. 8 ¶ 15. But the MIHL shares are not property of the estate because they were improperly transferred to Milio.    And Milio has no equity in the ClickSWITCH shares: they secure the claim of David and Christopher St. George (the "St. George Claim") per a June 21, 2018 Share Pledge Agreement between Milio and David and Christopher St. George (the "Share Pledge Agreement") (*see attached* Exhibit A). ~~After further analysis,~~ Milio has determined that it ~~would be costly litigation to attempt to avoid the~~ cannot avoid the Share Pledge Agreement, and therefore ~~has~~ Milio has no equity in the ~~determined that~~ the ClickSWITCH shares ~~have no value afterall~~. Finally, the Norman shares have no value. As a result, Milio has no real assets to speak of and thus no possibility of reorganizing.

Additionally, none of Milio's creditors oppose the Motion. David and Christopher St. George—who hold the largest and only secured claim—have no objection to the Motion. Three other alleged unsecured creditors—Christopher Garner, Cornelius Gregg, and James Turnbull—have indicated that they have no claims against the Debtor.  And the remaining claims listed on the Amended Schedules are contingent claims related to Milio International DMCC, Dubai ("Milio DMCC"), Milio E&P Ltd. ("Milio E&P"), and Milio International Ltd. (Jersey) ("Milio Jersey")—each of which is an insider company and none of which objects to the Motion.  Dismissal of this case would be in the best interests of Milio and its creditors.  Milio therefore respectfully moves the Court to order that relief.

### EXPEDITED RELIEF

The Debtor have asked the Court to resolve their Motion on an expedited basis.  Local Rule 9006-1(b) provides that "moving documents shall be filed and served . .. not later than fourteen days before the hearing date." Local Rule 9006-1(e),

however, provides that a court may reduce this notice period for cause. Cause exists in these cases to grant the Motion on an expedited basis. If the Motion is not granted expeditiously, the pending government shutdown may not allow the Court to hear this motion for months, and this delay will hurt creditors and the Debtor.

<u>**ARGUMENT**</u>

**I.     THE BANKRUPTCY CODE AUTHORIZES DISMISSAL OF A CASE FOR "CAUSE".**

Section 1112 of the Bankruptcy Code authorizes the dismissal of a chapter 11 bankruptcy case "for cause" upon motion by a party in interest. 11 U.S.C. § 1112(b)(1). Indeed, with limited, inapplicable exceptions, the Bankruptcy Code mandates the dismissal of a case when a party in interest demonstrates cause. *See, e.g.*, *In re Sanchez*, 429 B.R. 393, 399 (Bankr. D.P.R. 2010). For purposes of § 1112, a debtor qualifies as a party in interest. *See, e.g.*, 11 U.S.C. § 1109(b) (including the debtor as a "party in interest" under chapter 11); *see also, e.g.*, *In re TCR of Denver, LLC*, 338 B.R. 494, 500–01 (Bankr. D. Colo. 2006) (finding that a debtor can dismiss a case under § 1112(b)) and *In re Page*, 118 B.R. 456, 458 (Bankr. N.D. Tex. 1990) (concluding that a debtor is a party in interest under §1112(b)).

Section 1112 doesn't define "cause." Instead, it enumerates sixteen examples of circumstances that would constitute cause sufficient for dismissal. 11 U.S.C. § 1112(b)(4). The sixteen examples are just that—they are not an exhaustive list. *In re Reagan*, 403 B.R. 614, 621 (B.A.P. 8th Cir. 2009); *see also Loop Corp. v. Trustee*, 379 F.3d 511, n.2 (8th Cir. 2004) ("The bankruptcy court is not required, after all, to rigidly apply the enumerated grounds for cause . . . in a way that excludes consideration of all other factors[.]") and *In re Huckfeldt*, 39 F.3d 829, 831 (8th Cir. 1994) (discussing "cause" under § 707(a)).

Further, many of the § 1112(b) factors speak to a debtor's failure to perform its obligations under the Bankruptcy Code. *See, e.g.*, 11 U.S.C. § 1112(b)(4)(D), (F)–(K). For that reason, when the party moving for dismissal under § 1112(b) is the debtor, courts frequently ask in their "cause" inquiry whether a valid reorganizational purpose exists and whether that purpose can be achieved outside of bankruptcy. *See, e.g.*, *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119–20 (3d Cir. 2004); *see also Reagan*, 403 B.R. at 622 (discussing proposed payments to creditors outside of bankruptcy).

For example, the debtor may not have any assets to administer. *See, e.g.*, *In re AMC Realty Corp.*, 270 B.R. 132, 147 (Bankr. S.D.N.Y. 2001). Post-petition actions may have left no business to organize or claims to resolve. *See, e.g.*, *In re Gonic Realty Trust*, 909 F.2d 624, 627 (1st Cir. 1990) and *In re Gateway Ethanol, LLC*, No. 08–22579, 2011 WL 597059, at *1–2 (Bankr. D. Kan. Feb. 11, 2011). Settlement may achieve the reorganizational purpose for which the debtor filed for bankruptcy. *See, e.g.*, *In re Forum Health*, 444 B.R. 848, 856 (Bankr. N.D. Ohio 2011). Or all interested parties may agree that continuing the chapter 11 case isn't in their best interests. *See, e.g.*, *In re OptInRealBig.com, LLC*, 345 B.R. 277, 283–84 (Bankr. D. Colo. 2006).

## II.    CAUSE EXISTS TO DISMISS THIS CASE.

Cause exists to dismiss this chapter 11 bankruptcy case for at least two reasons: first, because Milio has no prospect of reorganizing, and second, because no creditor objects to Milio's Motion.

In the first instance, Milio has no prospect of reorganizing. One of Milio's three listed assets—the MIHL shares—was wrongfully transferred to Milio and therefore is not property of its estate. *See, e.g.*, *In re Archdiocese of St. Paul & Minneapolis*, 579 B.R.

188, 202 (Bankr. D. Minn. 2017) (a plan of reorganization "may not include[] as the property of the debtor's estate property that the debtor does not own"). The MIHL shares were in fact transferred from a related company, Milio Commodities Limited ("Milio Commodities") for no value or for such a low value that the transfer is voidable under the Insolvency Act, 2003 of the British Virgin Islands. After further analysis, Milio has determined that it has ~~weak~~ no defense~~s~~ to the voiding of such transfer. Milio agrees that the liquidators of  Milio Commodities are entitled to call for the immediate transfer of the MIHL shares into  the name of Milio Commodities. Thus, the MIHL shares are not property of Milio's bankruptcy estate.

With respect to the other two assets listed by Milio in its Petition and Schedules, after further analysis, Milio has determined that ~~the cost benefit analysis of trying to~~it cannot avoid the pledge of ClickSWITCH shares to David and Christopher St. George under the Share Pledge Agreement ~~is not worth the effort~~. Therefore, Milio ~~arguably have~~ has no equity in the ClickSWITCH shares. *See, e.g.*, *In re Gen. Stores Corp.*, 147 F. Supp. 350, 353–54 (S.D.N.Y. 1957). And the Norman shares have no value. *Id.* at ¶ 15.3.

In light of these circumstances, Milio has no possibility of reorganizing. Indeed, Milio's only asset of value—the ClickSWITCH shares—is currently pledged entirely to Milio's only secured (and only non-insider or related) claim—the St. George Claim. Even after committing the ClickSWITCH shares, though, the St. George Claim would *still* be unsatisfied by the full amount of the debt. Milio thus has no assets and no reorganization is possible ~~unless it were to successfully avoid the pledge~~. Milio can more cheaply and efficiently administer the ClickSWITCH shares outside of bankruptcy—*i.e.,* by David and Christopher St. George exercising their remedies under the Share Pledge Agreement. Dismissal is thus appropriate because no reorganization is likely.

Second, dismissal is appropriate because no creditor objects. David and Christopher St. George have informed Milio that they do not object to the Motion. Additionally, the Petition and Schedules list three unsecured non-insider claims: Christopher Garner for $150,000, Cornelius Gregg for $775,000, and James Turnbull for $2,800,000. Dkt. No. 1 at 6; Dkt. No. 9 at 1. But Mr. Garner, Mr. Gregg, and Mr. Turnbull have each signed a Notice of Withdrawal and Waiver of Claims related to these listed claims, stating that each represents that he has "no claims against the Debtor" and that the "Claim shall be deemed withdrawn with prejudice." (A copy of the Notice of Withdrawal and Waiver of Claims for Mr. Garner, Mr. Gregg, and Mr. Turnbull are attached as <u>Exhibit B</u>). Since these unsecured claimants have indicated that they have no claim against Milio, they are not interested parties here. *Cf* 11 U.S.C. § 1109(b) (listing a "creditor" as a party in interest).

Finally, the remaining listed claims in the Petition and Schedules are for affiliates of Milio—Milio DMCC, Milio E&P, and Milio Jersey. *See* Dkt. No. 9 at 1–2. None of these parties object to Milio's Motion. To the contrary, all interested parties agree that dismissal is appropriate and that the Court should order the requested relief.

Continuing this bankruptcy case will only increase the costs of administration; dismissing the case is in the best interests of Milio and its creditors. Faced with similar circumstances, courts have found that cause for dismissal exists. *See, e.g.*, *AMC Realty*, 270 B.R. at 147; *In re Sterling Bluff Investors, LLC*, 515 B.R. 902, 916–21 (Bankr. S.D. Ga. 2014); *In re Syndicom Corp.*, 268 B.R. 26, 50–55 (Bankr. S.D.N.Y. 2001); *In re Ellison Assocs.*, 63 B.R. 756, 766–67 (S.D.N.Y. 1983); *In re Eden Assocs.*, 13 B.R. 578, 584–85 (Bankr. S.D.N.Y. 1981). This Court should reach the same conclusion.

Dated:  January 25, 2019

/e/  John D. Lamey III
 John D. Lamey III, Esq. (#312009)
**LAMEY LAW FIRM, P.A.**
980 Inwood Avenue North
Oakdale, MN 55128
Telephone:  (651) 209-3550
*Attorneys for the Debtor*

## VERIFICATION

I, John P. Hart, declare under penalty of perjury that the facts set forth in the preceding Response are true and correct to the best of my knowledge, information, and belief.

Dated: January 25, 2019                    _____

                                           John P. Hart, Director

# **Exhibit A**

# SHARE PLEDGE AGREEMENT

THIS SHARE PLEDGE AGREEMENT (the "Agreement"), is made and entered into as of June 21, 2018, by and between MILIO INTERNATIONAL LIMITED, a Bahamas limited company ("Pledgor") and DAVID ST. GEORGE and CHRISTOPHER ST. GEORGE (collectively "Pledgee"), acknowledged by CLICKSWITCH HOLDINGS INC., a Delaware corporation (the "Company"), and consented to by the JOHN PAUL DEJORIA FAMILY TRUST (the "Dejoria Family Trust").

**WITNESSETH:**

WHEREAS, to secure the repayment of financial accommodations made by the Pledgee to 31 Brompton Square Limited and 31 Brompton Square Number 2 Limited (collectively the "Borrowers") pursuant to that certain Facility Agreement between Borrowers and Pledgee dated August 10, 2015 (as amended and supplemented by a letter of extension dated 21 December, 2015 and further amended and supplemented by a letter of extension dated 12 July 2016, the "Facility Agreement"), the Pledgor desires to pledge to the Pledgee a security interest in the Collateral (as defined below);

WHEREAS repayment of all amounts due and payable under the Facility Agreement was guaranteed by:

(a)    a guarantee dated 10 August 2015 given by Milio International DMCC (registered in Dubai with company number DMCC2579 whose registered office is at 40th Floor, Almas Tower, Jumeirah Lakes Towers, P.O. Box 340581 Dubai, UAE) in favour of the Pledgee in respect of all obligations and liabilities of the Borrowers under the Facility Agreement to the Pledgee;

(b)    a guarantee dated 17 August 2015 given by Milio Commodities Limited (the British Virgin Islands with number 1601776) in favour of the Pledgee in respect of all obligations and liabilities of the Borrowers under the Facility Agreement; and

(c)    a personal guarantee dated 10 August 2015 given by John Paul Hart (a British citizen holding British passport number 518385873, residing at Villa F81, Palm Jumeirah, PO Box 923007, Dubai, United Arab Emirates) in favour of the Pledgee in respect of all obligations and liabilities of the Borrowers under the Facility Agreement to the Pledgee

(referred to in this Agreement as the "Guarantees" and the parties thereto as guarantors as the "Guarantors");

WHEREAS, in connection with Section 2.20 and Section 2.21 of the Facility Agreement, this Agreement is given by the Pledgor in favor of the Pledgee to secure the payment and performance of all of the obligations of the Guarantors under the Guarantees and the obligations of the Borrowers under the Facility Agreement (together the "Secured Obligations");

WHEREAS, the Pledgor has guaranteed to the Pledgee the payment when due of all Secured Obligations;

1

WHEREAS, the Pledgor has guaranteed to the Pledgee the payment when due of all Secured Obligations;

WHEREAS, the Pledgee is requiring that the Pledgor execute and deliver this Agreement in consideration for and in connection with to the Facility Agreement;

WHEREAS, the Pledgor owns certain equity interests of the Company as set forth in Schedule A hereto, and will receive substantial direct and indirect benefits in connection with the Facility Agreement and the accommodations provided to the Borrowers thereunder, and has determined that it is in its best interests to execute and deliver this Agreement to provide additional security for the Secured Obligations; and

WHEREAS, Pledgor and Pledgee now desire to execute this Agreement upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein and in the Facility Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Definitions**.

(a)    Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement.

(b)    Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC.  However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

(c)    For purposes of this Agreement, the following terms shall have the following meanings:

"Collateral" has the meaning set forth in Section 3.

"Pledged Shares" means the shares described in Schedule A hereto and issued by the issuer named therein, and any other shares or similar equity interests arising from the Pledged Shares issued by such issuer named therein, now or hereafter acquired by the Pledgor directly in connection with the Pledged Shares and the certificates, instruments and agreements representing such equity interests and includes any securities or other interests, howsoever evidenced or denominated, received by the Pledgor in exchange for or as a dividend or distribution on or otherwise directly received in respect of such equity interests.

2

"<u>Proceeds</u>" means "proceeds" as such term is defined in Section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income arising directly from the Pledged Shares, collections thereon or distributions with respect thereto.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

**2.    <u>Conditions to Effectiveness</u>.** This Agreement shall only become effective upon and so is conditional upon the delivery of an executed counterpart (which may include a facsimile or other electronic transmission) of this Agreement from Pledgor, Pledgee, the Company and the John Paul Dejoria Family Trust.

**3.    <u>Pledge</u>**.  Pledgor and Pledgee hereby agree that the pledge of the Pledged Shares pursuant to this Agreement is being granted in lieu of the pledge of the membership interests of The Fusion Network LLC.  As security for the payment or performance in full of all of the Secured Obligations when due, the Pledgor hereby pledges, assigns and grants to the Pledgee, and hereby creates a continuing first priority lien and security interest in favor of the Pledgee in and to all of its right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired directly arising from the Pledged Shares (collectively, the "<u>Collateral</u>"), until such time as all amounts currently owed or hereinafter owing to Pledgee by the Borrowers under the Facility Agreement or otherwise comprising Secured Obligations are paid in full:

(1)    the Pledged Shares; and

(2)    all Proceeds and products of the foregoing, all books and records relating to the foregoing and all accessions to, substitutions and replacements for, and profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Pledgor from time to time with respect to any of the foregoing.

**4.    <u>Perfection of Pledge</u>.**

(a)    The Pledgor shall, from time to time, as may be reasonably required by the Pledgee with respect to all Collateral, take all actions as may be reasonably requested by the Pledgee to perfect the security interest of the Pledgee in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of Section 8-106 of the UCC, the Pledgor shall take all actions as may be reasonably requested from time to time by the Pledgee so that control of such Collateral is obtained and at all times held by the Pledgee, including without limitation delivery of the certificates or other instruments representing the Pledged Shares.  Without limitation of the foregoing the Pledgor shall deliver to the Pledgee (or, subject to Section 11(d), the Company) the Pledged Shares and all other

3

Instruments or Certificated Securities included in the Collateral, duly indorsed in a manner reasonably satisfactory to Pledgee, to be held as Collateral pursuant to this Agreement. All of the foregoing shall be at the sole reasonable cost and expense of the Pledgor.

(b)    If the Pledgor shall become entitled to receive or shall receive any certificate, option or rights in respect of the Pledged Shares, whether in addition to, in substitution of, as a conversion of, or in exchange for, any of the Pledged Shares, or otherwise in respect thereof, the Pledgor shall accept the same as Pledgee, hold the same in trust for Pledgee and deliver the same forthwith to Pledgee (or, subject to Section 11(d), the Company) in the exact form received, duly indorsed by the Pledgor to  Pledgee, if required, together with an undated instrument of transfer covering such certificate duly executed in blank by the Pledgor and with, if the Pledgee so requests, signature guaranteed, to be held by the Pledgee, subject to the terms hereof, as additional Collateral for the Secured Obligations.  Upon the occurrence and during the continuance of an Pledge Default, unless the Pledgee may otherwise agree, (i) any sums paid upon or in respect of the Pledged Shares upon the liquidation or dissolution of any issuer shall be paid over to Pledgee to be held, at Pledgee's option, either by it hereunder as additional Collateral for the Secured Obligations or applied to the Secured Obligations, and (ii) in case any distribution of capital shall be made on or in respect of the Pledged Shares or any property shall be distributed upon or with respect to the Pledged Shares pursuant to the recapitalization or reclassification of the capital of any issuer or pursuant to the reorganization thereof, the property so distributed shall, unless otherwise subject to a perfected Lien in favor of Pledgee, be delivered to Pledgee (or, subject to Section 11(d), the Company) to be held, at Pledgee's option, either by it hereunder as additional Collateral for the Secured Obligations or applied to the Secured Obligations.  Upon the occurrence and during the continuance of an Pledge Default, if any sums of money or property so paid or distributed in respect of the Pledged Shares shall be received by the Pledgor, the Pledgor shall, until such money or property is paid or delivered to Pledgee, unless Pledgee may otherwise agree, hold such money or property in trust for Pledgee, as additional Collateral for the Secured Obligations.

(c)    The Pledgor hereby irrevocably authorizes the Pledgee at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral.  The Pledgor agrees to provide all non-confidential information or confidential information with the consent of the Company, in each case, related only to the Pledged Shares or the Company, that is required by the Pledgee pursuant to this Section promptly to the Pledgee upon request.

**5.**    **Security for Obligations.** This Agreement secures the payment of all Secured Obligations now or hereafter existing under the Facility Agreement or the Guarantees and of the Pledgor under its guaranty thereof (as may be amended, amended and restated, supplemented, replaced, refinanced or otherwise modified from time to time (including any increases of the principal amount outstanding thereunder)), whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise.

4

**6.** **Rights Absent Default.** Throughout the term of this Agreement, so long as no "Pledge Default" as described in Section 7 hereof shall have occurred, Pledgor shall have all rights of ownership with respect to the Pledged Shares; *provided*, that no vote shall be cast or other right exercised or action taken in any violation of any provision of this Agreement; *provided further*, that, with the exception of any terms contained in the Shareholder Agreements (defined below), Pledgor shall not, without the prior written consent of the Pledgee in each instance, vote the Pledged Shares in favor of or consent to any resolution or action which does or might:

(a)     impose any additional restrictions upon the sale, transfer or disposition of the Collateral;

(b)     result in the issuance of any additional interest in the Borrowers, or of any class of security; or

(c)     vest additional powers, privileges, preferences or priorities in any other class of interest in the Borrower.

**7.** **Pledge Default.**

(a)     So long as (i) any Borrower has and continues to be in default under the Facility Agreement or any Guarantor has failed and continues to have failed to pay any amount demanded of it under any of the Guarantees, as applicable, (ii) that any Borrower or Guarantor has and has continued to fail to pay when due any amounts payable under the Facility Agreement or any Guarantee, as applicable, or (iii) Pledgor materially breaches any representation, warranty or covenant of Pledgor contained in this Agreement in any material respect (a "Pledge Default"), any or all of the Pledged Shares held by Pledgee hereunder may, at the option of Pledgee and in addition to any other rights Pledgee may possess in such event, be registered in the name of Pledgee or its nominees, as pledgees, and Pledgee or its nominees may thereafter, without notice, exercise all rights, privileges and options pertaining to the Pledged Shares as if it were the absolute owner thereof, including without limitation the right to receive dividends payable thereon, and the right to payment of any and all distributions upon the Pledged Shares upon the merger, consolidation, reorganization, recapitalization or other readjustment of the Company, all without liability except to account for property actually received by it, but Pledgee shall have no duty to exercise any of the aforesaid rights, privileges or options and shall not be responsible for any failure to do so or delay in so doing.

(b)     In the event of the occurrence of a Pledge Default, all distributions with respect to the Pledged Shares shall be paid to Pledgee, to be held by Pledgee as additional security hereunder until applied to towards any Secured Obligations owing to the Pledgee.

(c)     In the event of the occurrence of a Pledge Default, Pledgee, without demand of performance or other demand, advertisement or notice (except (i) the Pledgee shall give Pledgor

5

1 days' notice prior to exercising any remedies hereunder and (ii) any other notice required by law referred to below) of any kind to or upon Pledgor or any other person (all and each of which demands, advertisements and/or notices are, to the extent permitted by law, hereby expressly waived), may exercise any and all rights of a secured creditor under the UCC or any applicable law.    Without limiting the generality of the foregoing, the Pledgee, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except (i) the Pledgee shall give Pledgor 1 days' notice prior to exercising any remedies hereunder and (ii) any other notice required by law referred to below) to or upon Pledgor or any other Person (all and each of which demands (except any demand expressly provided for herein), defenses (other than a defense that the Secured Obligations have been paid in full in cash), advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Pledgee or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery with assumption of any credit risk.    The Pledgee may disclaim any warranties that might arise in connection with any such lease, assignment, grant of option or other disposition of Collateral and have no obligation to provide any warranties at such time. The Pledgee shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold.    Such sales may be adjourned and continued from time to time with or without notice. Pledgor further agrees, at the Pledgee's request, to assemble the Collateral and make it available to the Pledgee at places which the Pledgee shall reasonably select, whether at the Pledgor's premises or elsewhere.    To the extent permitted by applicable law, the Pledgor waives all claims, damages and demands (except any demand expressly provided for herein) it may acquire against the Pledgee arising out of the exercise by them of any rights hereunder.    If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.    To the extent permitted by applicable law, nothing contained herein shall be deemed to limit or restrict any other remedy available to Pledgee.    For the avoidance of doubt, this Agreement shall be subject to Sections 9-601 through 9-628 of the UCC.

(d)    Pledgor shall pay to Pledgee on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Pledgee in protecting, preserving or enforcing Pledgee's rights or remedies under this Agreement.

(e)    The proceeds of any disposition or other action by Pledgee may be applied, after Pledgee is in receipt of good funds, as follows: first, to the reasonable costs, expenses and attorneys' fees and expenses incurred by Pledgee for collection and for acquisition, completion, protection, removal, negotiation, valuation, sale and delivery of the Pledged Shares; second, to any fees or expenses due Pledgee under the Facility Agreement; third, to interest due on the Facility Agreement or otherwise payable under any of the Guarantees; fourth, to the principal due on the Facility Agreement or otherwise payable under any of the Guarantees; and fifth, any

6

surplus to the Pledgor or as required by law. For the avoidance of doubt, in the event of a Pledge Default or a default by any Borrower, the maximum amount that the Pledgee may realize under this Agreement is limited to the amount due by Borrowers, the Guarantors and the Pledgor (without double counting) under the Facility Agreement and the Guarantees and the Pledgor shall have no liability for any shortfall or deficiency.

(f)     The Pledgor hereby authorizes and instructs the Company to, and the Company agrees to, comply with any genuine instruction received by it from the Pledgee in writing that states that (x) a Pledge Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from the Pledgor, and the Pledgor and Pledgee agree that the Company shall have no liability for, and Pledgor and Pledgee shall indemnify, defend, and hold the Company harmless from any liability arising out of, such compliance.

(g)     The Pledgor hereby appoints, effective upon the occurrence of a Pledge Default, the Pledgee as the Pledgor's attorney-in-fact, with full authority in the place and stead of the Pledgor and in the name of the Pledgor or otherwise, during the continuance of a Pledge Default, in the Pledgee's discretion and in accordance with this Agreement to take any action and to execute any instrument which the Pledgee may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, to receive, endorse and collect all instruments made payable to the Pledgor representing any dividend, interest payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same (but the Pledgee shall not be obligated to and shall have no liability to the Pledgor or any third party for failure to do so or take action).  Such appointment, being coupled with an interest, shall be irrevocable.

(h)     Notwithstanding but subject to the foregoing, (i) Pledgee agrees that it will forbear from exercising and enforcing the rights and remedies as a result of any Pledge Default prior to December 31, 2018 (other than with respect to any Pledge Default arising from a breach by Pledgor of any representation, warranty or covenant contained in this Agreement) and (ii) Pledgee agrees that as a condition of taking possession of the Pledge Shares, it shall enter into any shareholder's agreement, right of first refusal and co-sale agreement and/or voting agreement requested by the Company (the "Shareholder Agreements") and be bound by, and subject to the terms of, the bylaws and other organizational documents of the Company (the "Organizational Documents"), provided that Pledgee is subject to substantially similar terms of such Shareholder Agreements and Organizational Documents as other similarly situated shareholders of the Company.

**8.**     **Protection of Interests.**  Pledgee may discharge taxes, liens, security interests or other encumbrances at any time validly levied against the Pledged Shares. Subject to the terms of the Facility Agreement, Pledgor agrees to reimburse Pledgee on demand for any payment so made or any expense incurred by Pledgee pursuant to the foregoing authorization, and any such payment made or expense incurred shall be added to and become a part of the obligation secured hereby.

7

9.      **Voting Rights and Dividends.**   Upon the occurrence and during the continuance of a Pledge Default, all rights of Pledgor to receive and retain profits, income, capital distributions, distributions, dividends, or surplus from the Company that it would otherwise be entitled to exercise or receive and retain hereunder shall cease, and all such rights shall thereupon become vested in Pledgee, who shall thereupon have the sole right to receive and retain such profits, income, capital distributions, distributions, dividends, and surplus.   Pledgor shall execute and deliver (or cause to be executed and delivered) to Pledgee all such assignments and other instruments as Pledgee may reasonably request for the purpose of enabling Pledgee to receive the dividends and distributions that it is entitled to receive and retain pursuant to the preceding sentence.   Any profits, income, capital distributions, distributions, dividends, or surplus from the Company received by Pledgor after the occurrence and during the continuance of a Pledge Default shall be deemed to be held in trust by Pledgor for the benefit of Pledgee.

10.     **Representations and Warranties of Pledgor.**   Pledgor hereby represents and warrants with respect to the Pledged Shares owned by the Pledgor that:

(a)     Pledgor, as of the date hereof, is the sole record and beneficial owner of the membership interest constituting the Pledged Shares and the Pledged Shares constitute all of the outstanding equity interests of the Company which are owned by the Pledgor.

(b)     Subject to the execution of this Agreement by the John Paul Dejoria Family Trust, the shares of common stock constituting the Pledged Shares are owned by Pledgor free and clear of any pledge, mortgage, hypothecation, lien, charge, encumbrance or any security interest, except for the security interest granted to Pledgee hereunder;

(c)     Upon Pledgor's execution of this Agreement, this Agreement creates and grants a valid lien on and perfected security interest in the Pledged Shares;

(d)     To Pledgor's knowledge, the Company has been duly and validly formed and is in good standing under the laws of the State of Delaware;

(e)     Subject to the execution of this Agreement by the John Paul Dejoria Family Trust, the Pledgor has full power, authority and legal right to pledge the Collateral pursuant to this Agreement;

(f)     This Agreement has been duly authorized, executed and delivered by the Pledgor and constitutes a legal, valid and binding obligation of the Pledgor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law);

(g)     The execution and delivery of this Agreement by the Pledgor and the performance by the Pledgor of its obligations thereunder, will not in any material respect violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court,

8

arbitrator or governmental authority, domestic or foreign, applicable to the Pledgor or any of its property, or the organizational or governing documents of the Pledgor or any agreement or instrument to which the Pledgor is party or by which it or its property is bound;

(h)    Subject to the execution of this Agreement by the John Paul Dejoria Family Trust, no person other than the Pledgee has control or possession of all or any part of the Collateral and, without limiting the foregoing, all certificates, agreements or instruments representing or evidencing the Pledged Shares in existence on the date hereof have been delivered to the Pledgee (or, subject to Section 11(d), the Company) in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank; and

(i)    By virtue of its direct or indirect equity interest in the Borrowers, the execution, delivery and performance of this Agreement is for the benefit of the Pledgor, and the Pledgor has received adequate consideration for this Agreement.

## 11.    <u>Additional Covenants of Pledgor</u>.

(a)    Other than as agreed by Pledgee, Pledgor hereby covenants that so long as Borrowers are obligated to make payments to Pledgee under the Facility Agreement, Pledgor will not sell, convey or otherwise dispose of any of the Pledged Shares or any interest therein, nor will Pledgor create, incur or permit to exist any pledge, mortgage, lien, charge, encumbrance or any security interest whatsoever with respect to the Pledged Shares or the proceeds thereof other than that created hereby.

(b)    Pledgor warrants and will defend Pledgee's right, title, special property and security interest in and to the Pledged Shares owned by Pledgor against the claims of any person, firm, corporation or other entity.

(c)    So long as the Pledge Shares are certificated, to the extent not previously delivered to Pledgee (or, subject to Section 11(d), the Company), Pledgor shall immediately deliver such certificate(s) to Pledgee (or, subject to Section 11(d), the Company) and take all actions necessary to insure Pledgee has a first priority security interest in the Pledged Shares.

(d)    The Company (i) agrees to hold the certificates and proxies in respect of the Pledged Shares as gratuitous bailee for the benefit and on behalf of the Pledgee for the benefit of the Pledgee and any assignee thereof solely for the purpose of perfecting by possession or control the security interest granted in such Pledged Shares pursuant to this Agreement and (ii) agrees to deliver such certificates and proxies to Pledgee in connection with Pledgee, upon a Pledge Default, delivering written instructions pursuant to Section 7(f).  The Company shall have no duty or liability to protect or preserve any rights pertaining to such certificates or proxies of the Pledged Shares and, except for gross negligence or willful misconduct by the Company, Pledgor and Pledgee hereby waive and release the Company from all claims and liabilities arising from or pursuant to the Company's role as gratuitous bailee with respect to such certificates or proxies of the Pledged Shares.

9

12.  **Further Documents.**

(a)     Pledgor shall, at any time and from time to time upon the written request of Pledgee, execute and deliver such further documents and do such further acts and things as Pledgee may reasonably request in order to effect the purposes of this Agreement, including, without limitation, in the event of a Pledge Default, delivering to Pledgee on the date hereof or at any time hereafter irrevocable proxies with respect to the Pledged Shares owned by Pledgor.

(b)     Pledgee will execute joinder agreements to the Company's Shareholder Agreements immediately upon their exercise of any rights under this Agreement and as a condition of taking possession of the Pledge Shares.

(c)     Pledgor, Pledgee and the Company hereby agree that the number Pledged Shares described on Schedule A attached hereto shall be automatically updated in the event that Pledgee releases shares to the Dejoria Family Trust in accordance with the consent by the Dejoria Family Trust attached hereto

13.  **Confirmation by the Company; Disclaimer; Indemnification.** Company confirms its acknowledgment of this Agreement. Notwithstanding the foregoing, the Company shall have no liability for the Pledgor's representations and warranties in Article 9.  Pledgor shall indemnify, defend, and hold harmless the Company against any liability (including reasonable attorney's fees) resulting from any actions taken by the Company in connection with this Agreement.

14.  **Waiver by Pledgee.**  Effective upon the execution of this Agreement by all parties, and in consideration of the Company's execution of this Agreement, Pledgee, and on behalf of each of his, as applicable, affiliates, and their respective successors, assigns, heirs, legal personal representatives, officers, directors, shareholders, agents, employees, representatives and insurers (collectively, the "Releasing Parties"), hereby unconditionally releases and forever discharges the Company and  its officers, directors, agents, employees, representatives and insurers (in each case, solely in their capacity as such), past and present, and the successors and assigns of each and all of the foregoing (collectively, the "Released Parties"), from any and all claims of one or more Releasing Parties against any Released Parties, that have (or may have) arisen, now exist or that may arise in the future out of the Company's entry into that certain Stock Transfer Agreement dated January 12, 2018, as amended as of June __, 2018, by and among Pledgor, the Company and the Dejoria Family Trust (the "Stock Transfer Agreement").  Pledgee understands and agrees that this discharge of claims extends to, but is not limited to, all claims which any Releasing Party may have against the Released Parties for the Company's entry into the Stock Transfer Agreement, whether known or unknown, legal or equitable, based upon statutory or common law rights, remedies or theories of any kind or nature.

15.  **Miscellaneous.**

(a) Notices, requests and other communications from one of the parties to the other shall be in writing and shall be considered to have been duly given if personally delivered,

10

or when deposited in the United States mail, first class, certified or registered, postage prepaid, return receipt requested, addressed to the respective party at the address set forth hereunder, or to such other address as such party may hereafter designate by written notice to the other party:

If to Pledgor:  c/o John Hart, 40th Floor, Almas Tower, JLT, Dubai, UAE, with a copy to Simon Walker 40th Floor, Almas Tower, JLT, Dubai, U.A.E. P.O. Box 340581.

If to Pledgee:  c/o Carey Olsen, Rodus Building, Road Reef Marina, Road Town, Tortola, British Virgin Islands; Attention: Ben Mays.

If to the Company:  c/o Cale Johnston and Drew Fanberg, 244 1st Avenue North, #100, Minneapolis, MN 55401.

If to the Dejoria  c/o John Paul DeJoria, 2934 Oestrick Ln, Austin, TX 78733.
Family Trust:

(b)  This Agreement may be supplemented, altered, amended or revoked only by a writing signed by all of the parties hereto.

(c)  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

(d)  If any provisions contained herein shall be declared unenforceable, invalid or void, the same shall not impair any of the other provisions contained herein which shall be enforced in accordance with its respective terms.

(e)  The headings preceding and labeling the paragraphs of this Agreement are for the purpose of identification only and shall not in any event be employed or used for the purpose of construction or interpretation of any portion of this Agreement.  This writing is intended by the parties as the final and binding expression of its contract and agreement and as the complete and exclusive statement of the terms thereof, and supersedes all prior negotiations, representations and agreements with respect to the subject matter hereof.  No waiver by any party of any default or nonperformance hereunder shall be deemed a waiver of any subsequent default or nonperformance.  All waivers shall be in writing, signed by the parties hereto.  As used herein and where necessary, the singular shall include the plural and vice versa, and masculine, feminine and neuter expressions shall be interchangeable.

(f)  This Agreement shall be binding upon, and the benefits and obligations provided for herein shall inure to, the parties hereto and their respective heirs, legal representatives, successors, assigns and transferees as the case may be.

(g)  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflict of laws principles thereof.

11

(h)     The security interest granted hereunder in the Pledged Shares shall terminate upon the repayment in full of the Secured Obligations or as otherwise agreed by Pledgor and Pledgee.  Upon termination of such security interests, Pledgee shall return the Pledged Shares to Pledgee, together with any related proxys.

*[Remainder of page left intentionally blank.  Signature page follows.]*

12

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

**PLEDGOR:**                                        **PLEDGEE:**

MILIO INTERNATIONAL LIMITED

By: _____        _____
Name:                                                David St. George
Title:

                                                    _____
                                                    Christopher St. George

**COMPANY**:

CLICKSWITCH HOLDINGS INC.

By: _____
Name:
Title:

*[Signature Page to Membership Interest Pledge Agreement between Milio International Limited and David and Christopher St. George]*

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

**PLEDGOR:**

MILIO INTERNATIONAL LIMITED

By:_____.
Name:
Title:

**PLEDGEE:**

_____
David St. George

_____
Christopher St. George

**COMPANY:**

CLICKSWITCH HOLDINGS INC.

By: _____
Name:
Title:

*[Signature Page to Membership Interest Pledge Agreement between Milio International Limited and David and Christopher St. George]*

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

**PLEDGOR:**                                                    **PLEDGEE:**

MILIO INTERNATIONAL LIMITED

By:_____                          _____

Name:                                                          David St. George

Title:
                                                               _____

                                                               Christopher St. George

**COMPANY:**

CLICKSWITCH HOLDINGS INC.

By:_____

Name: Cale Johnston

Title: CEO

*[Signature Page to Membership Interest Pledge Agreement between Milio International Limited and David and Christopher St. George]*

**Consent by the Dejoria Family Trust**

The Dejoria Family Trust hereby consents to the pledge and transfer (as applicable) of the Collateral under and in accordance with this Agreement and hereby waives any requirements under the Stock Transfer Agreement with respect thereto; provided, however, that effective as of immediately following the date that the Company completes the final closing for a fundraising that yields, in one or more closings, gross proceeds to the Company of at least $3 million *[handwritten: but not more than $3.5 million]*, Pledgee hereby releases sufficient shares from this Agreement and authorizes the Company and Pledgor to transfer such released shares to the Dejoria Family Trust, such that the Dejoria Family Trust will hold the level of ownership of the Common Stock of the Company contemplated by Section 2 of the Stock Transfer Agreement; provided, further, that the Dejoria Family Trust agrees that it shall comply with its obligations under the Organizational Documents.

**DEJORIA FAMILY TRUST**:

JOHN PAUL DEJORIA FAMILY TRUST

By: _____
Name:
Title:


**PLEDGEE:**

_____
David St. George

_____
Christopher St. George


*[Signature Page to Membership Interest Pledge Agreement between Milio International Limited and David and Christopher St. George]*

**Consent by the Dejoria Family Trust**

The Dejoria Family Trust hereby consents to the pledge and transfer (as applicable) of the Collateral under and in accordance with this Agreement and hereby waives any requirements under the Stock Transfer Agreement with respect thereto; provided, however, that effective as of immediately following the date that the Company completes the final closing for a fundraising that yields, in one or more closings, gross proceeds to the Company of at least $3 million, Pledgee hereby releases sufficient shares from this Agreement and authorizes the Company and Pledgor to transfer such released shares to the Dejoria Family Trust, such that the Dejoria Family Trust will hold the level of ownership of the Common Stock of the Company contemplated by Section 2 of the Stock Transfer Agreement; provided, further, that the Dejoria Family Trust agrees that it shall comply with its obligations under the Organizational Documents.

*but not more than $3.5 million*

DEJORIA FAMILY TRUST:

JOHN PAUL DEJORIA FAMILY TRUST

By:
Name: JOHN PAUL DEJORIA
Title: Trustee          Family Trust

PLEDGEE:

_____
David St. George

_____
Christopher St. George

*[Signature Page to Membership Interest Pledge Agreement between Milio International Limited and David and Christopher St. George]*

US-DOCS\101446593.14                    13

**SCHEDULE A**

**PLEDGED SHARES**

| Pledgor (owner of Record of such Pledged Shares) | Issuer | Pledged Equity Description | Number of Shares Held | Number of Shares Issued | Certificate Numbers |
|---|---|---|---|---|---|
| Milio International Limited | ClickSWITCH Holdings Inc. | Shares of Common Stock | 3,365,704 | 10,895,304 | |

15

# Exhibit B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **In re:** | ) Chapter 11 |
| | ) |
| **MILIO INTERNATIONAL LIMITED** | ) Case No. 18-34017 (WJF) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |

### NOTICE OF WITHDRAWAL AND WAIVER OF CLAIMS

1.      On December 30, 2018, Milio International Limited (the "Debtor") commenced voluntary cases under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Minnesota.  On January 8, 2019, the Debtor filed an Amendment to Petition, Schedules & Statements (Official Form 204), [Docket No. 9] (the "Schedule").

2.      I, James Turnbull (the "Claimant"), am listed in the Schedule as having an unsecured disputed claim in the amount of $2,800,000.00 (the "Claim").

3.      Claimant, on behalf of himself and his affiliates, hereby represents that Claimant and his affiliates have no claims against the Debtor.  The Claim shall be deemed withdrawn with prejudice.

Respectfully submitted,

By: _James Turnbull_ ...........................          Dated:  January 17, 2019

James Turnbull (Claimant)
Beach House, 7 Lower Mall
London W6 9DJ, UK
Telephone:      + 44 (0)7734 157 745
E-mail:          turnbjames@googlemail.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| In re: | ) **Chapter 11** |
| | ) |
| **MILIO INTERNATIONAL LIMITED** | ) **Case No. 18-34017 (WJF)** |
| | ) |
| Debtors. | ) **Jointly Administered** |
| | ) |
| | ) |

## NOTICE OF WITHDRAWAL AND WAIVER OF CLAIMS

1.      On December 30, 2018, Milio International Limited (the "Debtor") commenced voluntary cases under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Minnesota. On January 8, 2019, the Debtor filed an Amendment to Petition, Schedules & Statements (Official Form 204), [Docket No. 9] (the "Schedule").

2.      I, Christopher Garner (the "Claimant"), am listed in the Schedule as having an unsecured claim in the amount of $150,000.00 (the "Claim").

3.      Claimant, on behalf of himself and his affiliates, hereby represents that Claimant and his affiliates have no claims against the Debtor. The Claim shall be deemed withdrawn with prejudice.

Respectfully submitted,

By:.............................................      Dated: January 24, 2019

Christopher Garner (Claimant)
28 Wyatt House, Frampton Street
London NW8 8ND, United Kingdom
Telephone:      +44 (0)7971 485 007
E-mail:      chris@chrisgarner.co.uk

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **MILIO INTERNATIONAL LIMITED** | ) Case No. 18-34017 (WJF) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| | ) |

### NOTICE OF WITHDRAWAL AND WAIVER OF CLAIMS

1.     On December 30, 2018, Milio International Limited (the "Debtor") commenced voluntary cases under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Minnesota.  On January 8, 2019, the Debtor filed an Amendment to Petition, Schedules & Statements (Official Form 204), [Docket No. 9] (the "Schedule").

2.     I, Cornelius Gregg (the "Claimant"), am listed in the Schedule as having an unsecured claim in the amount of $775,000.00 (the "Claim").

3.     Claimant, on behalf of himself and his affiliates, hereby represents that Claimant and his affiliates have no claims against the Debtor.  The Claim shall be deemed withdrawn with prejudice.

Respectfully Submitted,

By:.....Cm Gregg........                    Dated: January 24 , 2019

Cornelius Gregg (Claimant)
P.O. Box 53619
Dubai, United Arab Emirates
Telephone:     +971 (0)50 554 9403
E-mail:        congregg@milio.com

US-DOCS\105372251.4